CHARLES S. COOK, Respondent, v. MISSOURI PA-
CIFIC RAILWAY COMPANY, Appellant.

### Kansas City Court of Appeals, May 5, 1902.

1. **Negligence: EVIDENCE: DEMURRER.** The evidence was suffi-
cient to send to the jury the question of negligence of the defend-
ant's baggage man in throwing a mailsack into the car.

2. **Personal Injury: PROXIMATE CAUSE: EVIDENCE: PRE-
JUDICE OF THE JURY.** The evidence relating to the cause of an
injury, resulting in the loss of an eye, is examined and *held*, when
taken with the amount of the verdict, to imply some prejudice on
the part of the jury, and the judgment is reversed.

3. **Contributory Negligence: PREPONDERANCE OF THE EVI-
DENCE: INSTRUCTION.** An instruction telling the jury that
contributory negligence must be *proven by the defendant* by the
greater weight of all credible evidence in the case and unless, etc.,
is held to be of very questionable propriety and its language criti-
cised as misleading.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,*
Judge.

REVERSED AND REMANDED.

*Elijah Robinson* for appellant.

(1)   The demurrer to the evidence should have been sus-
tained.   There is not a particle of evidence tending to show
negligence on the part of the defendant.   The simple fact that
plaintiff was struck by a mail cord (if such was the fact), is
no evidence of negligence on the part of defendant's baggage-
man, who was loading the mail into the car at the time the
accident is alleged to have occurred. Cooley on Torts (2 Ed.),

Vol 94 app—27

p. 92; Sheldon v. Sherman, 42 N. Y. 484; Roynton v. Rees, 9 Pick. 527; Express Co. v. Smith, 33 Ohio St. 511; Burton v. Davis, 15 La. An. 448; Brown v. Collins, 53 N. H. 442; Hanlon v. Ingram, 3 Ia. 81; Richards v. Rough, 53 Mich. 212. The rule *res ipsa loquitur* does not apply in this case. Gallagher v. Edison Ill. Co., 72 Mo. App. 576. (2) The verdict is so decidedly against the evidence in the case, that it is perfectly manifest that it was the result of passion or prejudice rather than of a fair and impartial consideration of the evidence and the instructions, and for this reason, if for no other, the judgment of the circuit court should be reversed. (3) The trial court committed error in giving plaintiff's instruction No. 2, for the reason that it was calculated to mislead the jury on the question of contributory negligence.

*Hollis & Fidler* for respondent.

(1) The demurrer offered by defendant was properly overruled. The evidence is abundant by plaintiff and his helper, and by the physical fact that the mail sack knocked his eye out, to support the finding of the jury that the agent of defendant was negligent in handling said mail sack. (2) The syphilitic part of the defense in this case is too weak to stand in court. No witness was offered by defendant who swore plaintiff had been afflicted with syphilis, but several swore he had not, and the jury so found. The doctrine of the assumption of risk has no application in this case; the rule of passenger applies. Mellor v. Railroad, 105 Mo. 455; McGoffin v. Same, 102 Mo. 540; Jones v. Railroad, 125 Mo. 666.

SMITH, P. J.—Action for recovery of damages for personal injuries. The petition alleged that on June 5, 1898, and for a long time prior thereto, he was and had been in the employment of the United States as railway postal clerk on defendant's train, running from Kansas City to Joplin, Mis-

ouri, by way of Pleasant Hill, and that while in the performance of his duty as such postal clerk in receiving the mail, one of the servants of defendant handled said mail in such a negligent manner that one of the sacks was thrown into plaintiff's face with such violence as to cause an injury which resulted in the loss of an eye, etc.

The answer was a general denial coupled with a plea of contributory negligence.    There was a trial which resulted in judgment for plaintiff, and defendant appealed.

I.    The defendant insists that the trial court erred in denying the demurrer offered by it at the conclusion of the evidence.    This contention we do not think should be sustained.    The plaintiff's own testimony was sufficient—barely so—to establish a prima facie case entitling him to a submission.    But even if this is so, shall the judgment stand?

It is somewhat doubtful, under the evidence, whether or not the plaintiff was struck in the eye at all with a mail sack or the end of one, but if such was the fact we think it still more doubtful whether or not the injury complained of was the result of that stroke, or whether or not the stroke was the *proximate cause* of the loss of plaintiff's eye.    Assuming that the defendant's baggageman did throw the sack from the truck into the mail car in such a way that it, or the cord used in connection with it, struck the plaintiff in the face or eye, it does not satisfactorily appear from the evidence that from the impact there was any bruise, contusion or abrasion about the eye, or discoloration of the eyelid, nor any congestion or inflammation of that organ nor any excretion of the lachrymal or tear gland.    Neither the plaintiff's helper on the same mail car, nor any of the trainmen, seem to have noticed anything of this kind, on the day of the alleged injury, nor at any day subsequent thereto.

It appears that on the next day after that of the accident the plaintiff visited Dr. DeLap, an occulist of Kansas City and a witness called by plaintiff, who testified that he exam-

ined the plaintiff's eye and "found nothing wrong with it apparently." He further testified that "there was very slight congestion of the retina of the optic nerve," but so slight that he attached no importance to it. "I dilated the pupil and told him to come back the next day, and then I made a more thorough examination and that was when I found the condition I have just related. I did not find inflammation. The second day I thought he had a slight congestion, but it was so slight that I did not attach any importance to it." This witness further testified "that twelve days later on, the plaintiff came back with fully developed inflammation of the optic nerve of the retina. The optic nerve, where it entered the eye, was then very much swollen and congested, the blood vessels greatly enlarged and tortuous, and a hazy condition of the whole retina." He thought that the condition of the plaintiff's eye might very well have resulted from syphilitic condition of his system.

Two or three witnesses testified that the plaintiff had stated to them that he had syphilis, another that he had chancroid and to still another that he had gonorrhea. It further appeared that prior to the accident plaintiff had visited Hot Springs, Arkansas, where he consulted a physician who prescribed certain medicines and baths, but the name of the physician nor that of the druggist who filled the prescription, he testified he could not recollect. Plaintiff further testified that before he went to Hot Springs he had an abrasion or sore on his genital organs and had had himself examined for syphilis.

Amongst other witnesses called by defendant to testify were three experts, namely, Doctors Thompson, King and Tyree, who by reason of their great learning and skill had become eminent in their profession, the last of whom had been appointed by the court to examine the plaintiff's eye. The first of these experts testified as follows:

"Q. If a man were struck on the eyelid with a mail cord, a knot similar to this one, and the blow was not sufficiently

hard to leave any external evidence of the fact, what would be your opinion as to whether that would result in the loss of the sight of the eye? A. Well, it depends on how hard the blow was, whether it hit the eyeball, whether it might not injure the eye and not leave a mark on the face. But do you mean to say a trifling blow or a severe blow? Q. I have described it as well as I can. I said a blow not sufficiently hard to leave any external evidence of the fact that there had been a blow on the outside of the lid. A. Yes, sir; such a blow can make a man blind. Q. Would you think it would be at all probable that a blow of that kind would result in that way? A. No, sir; not probable. Q. I will ask you to state what would be your opinion if a man called on you to examine his eye, say on the evening of the sixth day of a certain month, and you found no evidence of any thing whatever the matter with it; but the man claimed that he could not see and you dilated the eye and told him to call again the next morning and he called and you examined it again, with such instruments as you have for the purpose, and found slight congestion of the optic nerve, and twelve days afterwards he called again and you examined it and found a fully developed case of inflammation of the optic nerve of the retina, and from that time on it should grow worse until, say, the middle or last of the second month afterwards, and then you found ophthalmia and the eye totally blind, or practically so, what would be your opinion as to whether or not that probably resulted from being struck on the eyelid with a mail cord the day before the first examination? A. I wouldn't believe it; I don't think it could be. Q. I will get you to state whether such conditions as I have described result from other things than blows on the eye? A. Yes, sir. They very rarely result from a blow and very commonly result from other causes. Q. What other causes? A. Well, disease of the kidneys, internal poison of different kinds; syphilis, and sometimes cold, a simple cold sometimes. Sitting in a draught, having a cold draught blow on the eye

in some cases will cause it. . . . I never heard of a man go-ing to Hot Springs for gonorrhea.   Q.   Doctor, assuming that a man had a blow on the eye such as I have described, I have not been able to describe it any more minutely than that it was a blow, but not sufficient to leave a discoloration of the lid, and suppose also he had had syphilis, and you would be called upon to examine the eye and found the conditions I have described, what would you say as to what had caused that con-dition of the eye?   A.   I would be very much inclined to think it was the syphilis.   Syphilis will do it in seventy per cent of cases.   I don't mean to say that seventy per cent of the syphilitic cases have that inflammation; but that the in-. flammation will be caused by syphilis in a great majority of cases."

The second testified that:   "I do not believe that a blow on the outside of the eyelid with the knot of a mail cord, like this, not sufficiently hard to produce any discoloration, or leave any external evidence of the fact that there had been a blow, could produce blindness in that eye by the next day.   I can not conceive of such a thing.   Q.   Now, suppose a man had come to you on the sixth day of June, 1898, and you exam-ined his eye and could not see anything the matter with it, though he complained of not being able to see out of that eye. You dilated it and the next day you examined it again and found slight congestion of the optic nerve, and twelve days afterwards you examined it again and found a fully devel-oped case of inflammation of the optic nerve and you contin-ued treating him from time to time until the middle to the last of August, when you found atrophy, and reached the con-clusion that the sight was gone and there was no use to treat him any further.   Would you say that condition could not have been brought about by a blow on the outside of the eyelid with a mail cord?   A.   I would say that the very fact of the presence of inflammation in the optic nerve would exclude the idea of a blow.   Q.   Why?  . A.   Simply because blindness

caused by a blow would produce atrophy of the optic nerve without inflammation. Inflammation presupposes the idea of infection. You can not have inflammation without some cause of infection. It may be syphilitic or it may be ordinary pus, of the germs of which we give numerous names but which can be demonstrated by culture in vials. But an inflammation following a blow, the inflammation coming I would regard simply as a coincident. If a man loses his eye through inflammation of the optic nerve of the retina, I would know that was caused from inflammation of some kind, because from injury, traumatism or blow. If a man loses his sight he always does it by a complete perishing away, which we call atrophy, and without inflammation. Q. Now, tell the jury what causes the condition I have described; what it would probably result from? A. Well, it might result from syphilis. It may result from other kinds of infection. Syphilis is an infectious disease. There is a specific infection. It may be from other causes in which the infective material had gotten into the eye and produced the inflammation of the optic nerve, if it was inflamed. There are quite a number of things I might mention. It may come from disease of the kidneys and it may be effected from Bright's disease, where the circulation is poisoned. It is simply impossible for the conditions I have described to have been caused by a blow."

The third: "From the examination I made, I found atrophy of the nerve. He is blind in that eye. I can hardly give an opinion as to the cause of it. The condition is there; that is all. That condition comes from constitutional disease, such as syphilis, and from alcohol and tobacco. And there are other things which might produce it; pressure along the nerve from hemorrhage, tumors and things of that sort, either inside or outside. A blow sufficient to fracture the orbit might produce hemorrhage and pressure on the nerve so as to destroy it in this way, resulting in such an appearance as that in after time. That is about all that I can remember. Pos-

sibly rheumatism might do it. Any other debilitating cause might produce it if long continued. I have known of blows that left no external evidence, stun the retina so as to produce temporary blindness, but the sight is gradually regained. Q. Suppose the plaintiff in this case, or any one else, had called on you the afternoon of the sixth of June, 1898, and you had examined the eye and was not able to discover anything the matter with it. You dilated the eye and told him to call again the next day, and the next day he called again and you made an examination and found slight congestion of the optic nerve and retina. Now, twelve days after that time he called in again and you made an examination and found a fully developed case of inflammation of the optic nerve, and you saw him from time to time and this inflammation grew worse until, say, the middle to the last of August and then you found atrophy and concluded that he had permanently lost the sight of the eye. Would you think, or not, that that condition would probably have resulted from the blow with a mail cord, such as I have shown you here, and a blow which was not sufficient to leave any discoloration or external evidence of the fact that there had been a blow? A. I never saw inflammation of the optic nerve produced by a blow in that way. I don't know that ever—well, there is one authority that makes mention of it. But I never saw it, and I am inclined to believe it can not occur. My experience is it could not. It would be much more apt to make inflammation of some of the other parts. I never saw a case produced by such a blow. Q. Now, Doctor, if a man would come to you under the circumstances I have detailed in the former question, and you found his eye in the condition at the several examinations that I have mentioned, and you ascertained that that man at one time had an abrasion on his private parts, and had had himself examined with a view to ascertaining whether he had syphilis, and had been to Hot Springs, and at some time after that, and at least two years prior to the time he is now complaining of,

he had had weakness of the eyes, which were inflamed to such an extent that he had to leave his employment, which is that of mail clerk, get leave of absence, and had to wear colored glasses, and at the time he assured you that the result of his examination by the physician was that he had not syphilis; to what would you attribute the loss of the eyesight? A. If I should get the history as you have stated it? Q. Yes. A. *I should say it was from syphilis.*"

In rebuttal Dr. Sherrer, an oculist who had been practicing for three years, testified that at the time he had examined plaintiff and found no traces of syphilis and that plaintiff then told him that he had been suspected of having syphilis. The plaintiff testified that while he had caused himself to be examined for syphilis, he was told by the examining physician that he did not think he was ever afflicted with that disease. The plaintiff's testimony was equivocating and contradicted in many material particulars and is calculated to impress the impartial mind very unfavorably as respects its truthfulness and reliability.

After examining the whole evidence, to much of which we have not been able to more than allude, it is quite difficult to resist the conclusion that the verdict, which was for twenty-five hundred dollars, is so greatly against its preponderance as to imply some prejudice, and such being our conclusion it results that a judgment rendered on such a verdict ought not to stand. Baker v. Stonebraker, 36 Mo. 345; Price v. Evans, 49 Mo. 396; Vautrain v. Railroad, 78 Mo. 44; Rosecrans v. Railroad, 83 Mo. 678; Spohn v. Railroad, 87 Mo. 74; Cannon v. Moore, 17 Mo. App. 92.

II. The plaintiff's instruction No. 2 told the jury, amongst other things, "that contributory negligence is a defense pleaded by the defendant and must be *proven by the defendant* by the greater weight of all the credible evidence in the case, and unless you believe the defendant has shown by such," etc., then defendant has failed to support its defense.

The action of the court in the giving of this instruction is certainly of very questionable propriety. Its language is very well calculated to mislead the jury. Any jury of average intelligence might, under such an instruction, be led to believe it to be its duty to exclude from consideration, on the issue of contributory negligence, the testimony of the plaintiff himself, and it might conclude that if the defendant should rely, to support the affirmative of this issue, on that of the plaintiff himself—defendant introducing none itself—that the preponderance of all the evidence on this issue was in favor of the negative.

A number of other errors have been assigned for a reversal of the judgment but they have been found to be without merit.

In any view of the case that we have been able to take we can not resist the conclusion that the judgment ought to be overthrown. We feel that' the case disclosed by the record is such as requires a new trial. The judgment will accordingly be·reversed and the cause remanded. All concur.